UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD MOORE, | No.  1:14-cv-01067 DAD[1] SKO |
| Plaintiff, | |
| v. | |
| FATEMAH SANIEFAR dba ZLFRED'S; GHOLAMREZA SANIEFAR dba ZLFRED'S; ZLFRED'S, INC., a California corporation; ALIREZA SANIEFAR, Trustee of the BOST TRUST, | ORDER |
| Defendants. | |
| _____ | |
| AND RELATED COUNTERCLAIMS. | |

Plaintiff Ronald Moore brings this action under the Americans with Disabilities Act (ADA), the Unruh Act, and California Health and Safety Code § 19959.  Second Am. Compl. (SAC), ECF No. 32.  In response, defendants Fetemah Saniefar, Gholamreza Saniefar, and Zlfred's Inc. (collectively, "counterclaimants") have filed a counterclaim alleging Moore violated the Racketeer Influenced and Corrupt Organizations Act (RICO).  Countercl., ECF No. 33.  They

---

[1] Judge Mueller heard the motions addressed by this order on December 4, 2015.  ECF No. 70.  Subsequently, the case was reassigned to Judge Dale A. Drozd.  Judge Mueller issues the following order because she heard the motions.

1

bring the counterclaim against plaintiff Moore, Kenneth Randolph Moore, Geoshua Levinson, and West Coast CASp and ADA Services (WCC) (collectively "the Moores" or "counterdefendants"), alleging a pattern of racketeering activities through the filing of ADA claims designed to defraud the public as well as counterclaimants.  *Id.* ¶¶ 11–12.  Also, counterclaimants request the court amend the scheduling order to allow additional discovery related to the RICO counterclaim.  ECF No. 51-1.

The Moores filed a motion to dismiss the counterclaim, invoking Federal Rule of Civil Procedure 12(b)(6).  Mot., ECF No. 41-1.  Counterclaimants filed an opposition, ECF No. 55, and the Moores replied, ECF No. 59.  A hearing on the motions to dismiss and amend the scheduling order took place December 4, 2015, at which Tanya Moore appeared for the Moores and Mozhgan Saniefar appeared for counterclaimants.  ECF No. 70.  As explained below, the Moores' motion to dismiss is GRANTED.  Because this motion is granted, counterclaimants' motion to modify the scheduling order is DENIED as MOOT.  Additionally, because Zlfred's pending motion for sanctions is based on the same conduct giving rise to the counterclaim, ECF No. 58, the motion for sanctions is DENIED.

I.    JUDICIAL NOTICE

Counterclaimants request the court take judicial notice of several documents filed by counterdefendants, state courts, and federal courts in past cases.  Countercls.' Opp'n 6 n.1, ECF No. 55.  These documents were not attached to the operative counterclaim, but to a declaration submitted in conjunction with counterclaimants' opposition.  *See* Saniefar Decl., ECF No. 56.  The Moores object in part to the request for judicial notice.  *See* ECF No. 59-2 at 2-3.

The court generally confines itself to the four corners of a complaint or counterclaim in ruling on a Rule 12(b)(6) motion.  *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1203–04 (N.D. Cal. 2014); *see also Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007) ("[A] court may generally consider only allegations contained in the pleadings.").  However, the court can consider documents incorporated into the counterclaim by reference, as well as any relevant matters subject to judicial notice.  *Swartz*, 476 F.3d at 763.

1    A court may take judicial notice of an adjudicative fact if requested by a party and
2 "supplied with the necessary information." Fed. R. Evid. 201(c)(2). An adjudicative fact may be
3 judicially noticed if it is not subject to reasonable dispute in that it is either (1) generally known
4 within the territorial jurisdiction of the trial court or (2) capable of accurate and ready
5 determination by resort to sources whose accuracy cannot reasonably be questioned. Fed. R.
6 Evid. 201(b). The party who requests judicial notice bears the burden of persuasion to show the
7 matter in question satisfies Rule 201. *Newman v. San Joaquin Delta Cmty. Coll. Dist.*,
8 272 F.R.D. 505, 516 (E.D. Cal. 2011).

9    A court "may take judicial notice of matters of public record, including duly
10 recorded documents, and court records available to the public through the Pacer system[2] via the
11 internet." *Peviani v. Hostess Brands, Inc.*, 750 F. Supp. 2d 1111, 1116 (C.D. Cal. 2010) (citing
12 *C.B. v. Sonora Sch. Dist.*, 691 F. Supp. 2d 1123, 1138 (E.D. Cal. 2009) (internal citations
13 omitted)). Documents are judicially noticeable, however, only for the purpose of determining
14 what statements are contained therein, not to prove the truth of the contents or any party's
15 assertion of what the contents mean. *United States v. S. Cal. Edison Co.*, 300 F. Supp. 2d 964,
16 975 (E.D. Cal. 2004). Accordingly, to the extent counterclaimants seek judicial notice of the
17 veracity or authenticity of any arguments or conclusions of fact or law contained in documents,
18 the request is denied. *Id.* at 976 (judicially noticing the existence of a document entitled "Forest
19 Service Handbook" but not conclusions of fact or law within it).

20    Counterclaimants ask the court to judicially notice the following documents
21 (1) Ronald Moore's Declaration submitted in the case of *Hernandez, Wallen, Moore v. Vallco*
22 *International Shopping Center, LLC, et al.*, No. 10-02848 (N.D. Cal. filed June 29, 2010); (2) an
23 opposition to a motion to dismiss that the Moore Law Firm filed in the same *Hernandez* case;
24 (3) an order on a motion to dismiss, also from the same *Hernandez* case; (4) a motion for
25 summary judgment filed by Ronald Moore in *Moore v. Dollar Tree Stores, Inc.*, Case No. 13-

---

[2] The PACER system is the court-generated database that provides public access to court electronic records.

01336 (E.D. Cal. filed Aug. 22, 2013); (5) Ronald Moore's declaration submitted on October 15, 2014 in the same *Dollar Tree Stores* case; (6) an exhibit filed in the same *Dollar Tree Stores* case, containing Ronald Moore's Second Supplemental Response to Defendant Dollar Tree Stores, Inc.'s First Set of Interrogatories; (7) two Geoshua Levinson declarations filed in *Millennium Acquisitions, LLC v. Geoshua Levinson, et al.*, No. 15CECG01815 (Cal. Super. Ct. Fresno. filed June 9, 2015); and (8) a letter from Dennis Corelis of the California Department of General Services dated October 22, 2015 and filed in the Fresno *Geoshua Levinson* case.  Saniefar Decl., ECF No. 56.  The Moores object only to the court's taking notice of the eighth item, the letter from Mr. Corelis.  ECF No. 59-2.

All documents covered by the request, including the letter from Mr. Corelis, were filed in past cases and constitute matters of public record.  The fact that these documents exist can and will be judicially noticed.

## II.     BACKGROUND

### A.     Ronald Moore's ADA Claim

Fatemah Saniefar and Gholamreza Saniefar work at the restaurant Zlfred's.  SAC ¶¶ 1–2.  Plaintiff Ronald Moore filed suit against Zlfred's on August 8, 2014, alleging violations of the ADA, Unruh Act, and California Health and Safety Code § 19955(a).  *See generally* Compl., ECF No. 1.  Ronald Moore filed a second amended complaint, the operative complaint, with the same claims on June 4, 2015.  *See generally* SAC.

In the operative complaint, Ronald Moore alleges he is disabled as defined by the ADA, for he requires the use of a wheelchair in public.  SAC ¶ 9.  With his disability, Moore alleges he encountered several barriers when he visited Zlfred's on April 14, 2014.  For example, Moore said he could not get his wheelchair into the bathroom stall because it lacked the necessary wheelchair clearances.  *Id.* ¶ 11(c).  When trying to leave the restroom, Moore became trapped.  *Id.* ¶ 11(h).  As a result, he required his grandson's assistance to make his way out of the bathroom.  *Id.*  Outside of barriers Moore personally encountered, he alleges Zlfred's built exterior routes of travel with excessive cross slopes, did not provide the proper number of accessible parking stalls, and did not provide proper tow away signage.  *Id.* ¶ 12.  Because of

these and other barriers, Moore alleged he was, and continues to be, deterred from visiting Zlfred's. *Id.* ¶ 13.

B. <u>Counterclaim</u>

As noted, the counterclaim alleges the Moores violated the Racketeer Influenced and Corrupt Organizations Act (RICO). Countercl. ¶ 59. The counterclaim also names Kenneth Randolph Moore and Geoshua Levinson, who are relatives of Moore, and WCC, Levinson's business. *Id.* ¶ 2. Counterclaimants make the following allegations, which at this stage the court accepts as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, counterclaimants allege Moore is not really disabled. *See* Countercl. ¶ 53. At times from March to April 2015, Moore was videotaped during surveillance walking by himself and without any aid. *Id.* This surveillance footage features Moore standing up, kicking while standing, walking over uneven surfaces, bending over to pick up items, and lifting his wheelchair into the trunk of his car, all without assistance. *Id.* Counterclaimants further allege Moore can easily lift his wheelchair and put it into the trunk of his Suburban without any difficulty. *Id.* ¶ 51. Counterclaimants allege Moore has no problem reaching, bending, and lifting at various times. *Id.* Accordingly, counterclaimants allege Moore's testimony in declarations and in depositions is premised entirely on a falsehood. *Id.* ¶ 53.

Second, counterclaimants allege Moore lied about visiting the various entities against which he has filed suit, including regarding purported visits to nine facilities where he says he experienced discrimination, all in the course of one day. *See id.* ¶¶ 46–49. Similarly, while Moore alleges he visited Zlfred's on April 14, 2014, Gholamreza Saniefar, who was present that night, did not see Moore in the restaurant. *Id.* ¶ 49.

Third, counterclaimants allege Moore, with other counterdefendants, engaged in a family run conspiracy to make money for all involved in the conspiracy at the expense of California businesses and residents. *Id.* ¶ 40. In this conspiracy, Kenneth Moore and Ronald Moore are brothers, and Geoshua Levinson is the step-son of Kenneth Moore. *Id.* ¶¶ 22, 28. Kenneth Moore is a partner at the Moore Law Firm, which represents Moore, Geoshua Levinson is an agent for WCC, a California corporation which purports to assist companies in complying

5

with the ADA, and Moore is the plaintiff in this and other ADA cases brought against numerous entities. *Id.* ¶¶ 8, 20, 22.

Counterclaimants allege the Moores engaged in a conspiracy through claiming to serve businesses with complaints based on ADA compliance issues. First, WCC advertised on its website that it helps Californians "comply with Access Standards for Federal ADA and the California Building Code." *Id.* ¶ 29. When residents and businesses use the WCC website, counterclaimants allege such businesses unknowingly self-report themselves to the Moore Law Firm, which then uses this information to initiate suits on behalf of the clients they represent in ADA litigation. *Id.* ¶ 37. Ronald Moore is one of those clients. *Id.* ¶¶ 20, 22. In carrying out this conspiracy, the Moores incorporate false assertions about Ronald Moore's disability and visits into "complaints, discovery, correspondence, and other documents related to the litigation," which they routinely send through mail and email. *Id.* ¶¶ 67, 72.

Since 2009, Ronald Moore has filed more than 250 ADA cases in the Eastern District of California as well as 10 ADA cases in the Northern District of California. *Id.* ¶ 19. In most if not all of these cases, Moore has requested $4,000 in statutory damages, as well as attorneys' fees. *Id.* All but one of these cases has resulted in settlement. *Id.* ¶ 43. The only case that went to trial resulted in a loss for Moore. *Id.* ¶ 43. In that case, the court's opinion cast doubt on the credibility of Ronald Moore and Randy Moore. *Id.*[3] Overall, based on the cases that have settled, Moore is estimated to have received over $1,000,000 in settlement payments. *Id.* ¶ 56.

III.  LEGAL STANDARD

A party may move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The motion may be granted only if the complaint lacks a "cognizable legal theory" or if its factual allegations do not support a cognizable legal theory. *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013). The court

---

[3] Counterclaimants do not cite the case referenced. Nonetheless, the court construes allegations in the light of the non-moving party, even if doubtful in fact. *Bell Atl. Corp. v. Twombly* ("*Twombly*"), 550 U.S. 544, 555 (2007).

assumes these factual allegations are true and draws reasonable inferences from them. *Ashcroft*, 556 U.S. at 678.

A complaint need contain only a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), not "detailed factual allegations," *Twombly*, 550 U.S. at 555. But this rule demands more than unadorned accusations; "sufficient factual matter" must make the claim at least plausible. *Ashcroft*, 556 U.S. at 678. Accordingly, conclusory or formulaic recitations of a cause's elements do not alone suffice. *Id.* (quoting *Twombly*, 550 U.S. at 555).

Evaluation under Rule 12(b)(6) is a context-specific task drawing on "judicial experience and common sense." *Id.* at 679. Aside from the complaint, district courts have discretion to examine documents incorporated by reference, *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1160 (9th Cir. 2012); affirmative defenses based on the complaint's allegations, *Sams v. Yahoo! Inc.*, 713 F.3d 1175, 1179 (9th Cir. 2013); and proper subjects of judicial notice, *W. Radio Servs. Co. v. Qwest Corp.*, 678 F.3d 970, 976 (9th Cir. 2012).

A defendant's counterclaims are held to the same pleading standards as a plaintiff's complaint. *Lennar Mare Island, LLC v. Steadfast Ins. Co*., No. 12-02182, 2015 WL 6123730, at *11 (E.D. Cal. Oct. 16, 2015).

IV.     DISCUSSION

The Moores argue the counterclaim should be dismissed because (1) the *Noerr-Pennington* doctrine bars counterclaimants' RICO claim; and (2) alternatively, counterclaimants have not and cannot adequately allege a RICO violation occurred. Mot. at 6–7. In response, counterclaimants contend (1) the counterclaim falls within the sham exception to the *Noerr-Pennington* doctrine; and (2) they have pled facts sufficient for a RICO violation. Countercls.' Opp'n at 9–22. These issues are addressed in turn below.

   A.     *Noerr-Pennington* Doctrine

The Moores argue the RICO counterclaim is barred because the activity giving rise to the RICO claim, the underlying ADA suit, is "petitioning activity," which is immune from liability under the *Noerr-Pennington* doctrine. Mot. at 9. Counterclaimants assert the activity

giving rise to the RICO claim falls within the "sham exception" to *Noerr-Pennington*, and as such, the RICO claim is not barred. Countercls. 'Opp'n at 9–12.

Under the *Noerr-Pennington* doctrine, those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct. *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006). The doctrine derives from the First Amendment's guarantee of "the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. Amend. I; *see also Sosa,* 437 F.3d at 929. Petitions covered by the doctrine include "communications to the court" such as a "[a] complaint, an answer, a counterclaim and other assorted documents and pleadings, in which plaintiffs or defendants make representations and present arguments to support their request that the court do or not do something." *Sosa*, 437 F.3d at 933.

The *Noerr-Pennington* doctrine first arose in the antitrust context and initially reflected the Supreme Court's effort to reconcile the Sherman Act with the First Amendment's Petition Clause. *Id.* at 929. The classic case included one company's petitioning a branch of government to influence legislation or law regulating that company. *Id.* In response, companies in the same market would bring suit against the petitioning company, alleging its efforts to influence legislation violated the Sherman Act. *Id*. When faced with these cases, the Supreme Court held "the Sherman Act d[id] not prohibit . . . persons from associating . . . in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly." *E.R.R. Presidents Conference v. Noerr Motor Freight, Inc.* (*Noerr*), 365 U.S. 127, 136 (1961). The Supreme Court later extended its holding to include companies engaged in lobbying activities directed toward executive branch officials, in *United Mine Workers v. Pennington* (*Pennington*), 381 U.S. 657, 670–72 (1965). The Court later further extended the doctrine to the "channels and procedures of state and federal . . .courts." *Cal. Motor Transp. Co. v. Trucking Unlimited* (*Trucking Unlimited*), 404 U.S. 508, 511 (1972). With each decision, the Supreme Court recognized that construing the Sherman Act to reach such petitioning conduct "would raise important constitutional questions" respecting the right of petition. *Noerr*, 365 U.S at 138; *see also Pennington*, 381 U.S. at 672; *Trucking Unlimited*, 404

U.S. at 510. As such, the Court concluded, it "cannot . . . lightly impute to Congress an intent to invade . . . freedoms" protected by the Bill of Rights. *Noerr*, 365 U.S at 138; *Trucking Unlimited*, 404 U.S. at 510.

Recognizing the doctrine's constitutional foundation, the Supreme Court has applied *Noerr-Pennington* principles to contexts other than antitrust. *Sosa*, 437 F.3d at 930. For example, in *BE&K Constr. Co. v. NLRB*, the Court made clear the principles of statutory construction embodied in the *Noerr-Pennington* doctrine, namely the right to petition the government, applied with full force in other statutory contexts. 536 U.S. 516, 525 (2002). The Ninth Circuit's later decision in *Sosa* reflected this holding and concluded the *Noerr-Pennington* doctrine is not limited to the antitrust context, but "applies equally in all contexts." *Sosa*, 437 F.3d at 931.

1. Sham Exception

a) Applied to RICO Cases

*Noerr-Pennington* immunity is not a shield for petitioning conduct that, although "ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *Sosa,* 437 F.3d at 938. In *Sosa,* the Ninth Circuit held this sham exception applies more broadly if one of three different circumstances occurred (1) where the lawsuit is objectively baseless and the defendant's motive in bringing it is unlawful; (2) where the conduct involves a series of lawsuits "brought pursuant to a policy of starting legal proceedings without regard to the merits" and for an unlawful purpose; or (3) if the allegedly unlawful conduct "consists of making intentional misrepresentations to the court, litigation can be deemed a sham if a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy." *Id.* The court in *Sosa* declined to determine whether the exception applied to activities giving rise to RICO claims. *See id.*

The Circuit later clarified that the sham exception does apply to RICO claims in *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 648 (9th Cir. 2009). In *Kearney*, a school and the law firm representing the school had brought an eminent domain proceeding in state court

9

1   against Kearney, the landowner. *Id.* at 642.  Prior to the eminent domain proceeding, the school

2   initiated a condemnation process against Kearney's property. *Id.*  As part of the condemnation

3   process, the school hired a construction company to conduct a septic system assessment,

4   including percolation testing,[4] on the property. *Id.*  The testing results would reveal the number

5   of residential lots the land could support, and in turn help determine the land's value. *Id.*  When

6   the construction company completed its percolation testing, the school's law firm did not produce

7   a formal report of the results. *Id.*  During discovery, when the landowner requested the results,

8   the law firm did not produce them. *Id.*

9          During the eminent domain proceeding, the landowner's expert testified the

10  property was worth $1.4 million. *Id.*  The school's expert testified the property was worth

11  $850,000. *Id.*  The school's attorney represented to the court that no percolation testing had been

12  performed. *Id.*  The jury awarded the landowner $953,000 in compensation. *Id.*  After trial, the

13  landowner learned that percolation testing had in fact been in fact been performed. *Id.*  When he

14  obtained the report and reviewed the results, the landowner discovered the results supported a

15  higher value for the property. *Id.* at 642–43.  The landowner then brought a RICO claim against

16  the school's law firm. *Id.* at 642.

17         In considering the landowner's RICO claim, the circuit held the percolation testing

18  was protected by the *Noerr-Pennington* doctrine because it was incidental to the eminent domain

19  proceeding and thus was interconnected with petitioning the government. *See id.* at 646.  Next,

20  the court determined whether the sham exception applied to the law firms' conduct. *Id.* at 645.

21  In doing so, the court assessed whether the law firm's allegedly unlawful conduct consisted "of

22  making intentional misrepresentations to the court," and whether those misrepresentations or the

23  "party's knowing fraud upon . . . the court deprive[d] the litigation of its legitimacy." *Id.* at 646.

24  The court concluded that the act of suppressing the results constituted the kind of misconduct the

---

[4] A percolation test is designed to determine the suitability of a site for a subsurface private sewage disposal system, otherwise known as a septic system. More specifically, a percolation test measures the ability of the soil to absorb liquid. Septic system designers use the results of percolation tests to properly construct septic systems. *See* Percolation Test, available at http://www.percolationtest.com/.

1    sham exception was meant to address and so the sham exception applied.  *See id* at 646, 650.
2    Thus, the court concluded the *Noerr-Pennington* doctrine did not immunize the law firm and
3    school district from RICO liability.  *Id.* at 650.  The case was remanded to the district court to
4    determine whether the defendants had violated RICO.  *Id.* at 648.
5             In sum, *Kearney* teaches that the sham exception applies to RICO cases where a
6    defendant's unlawful conduct consists of making intentional misrepresentations to the court with
7    the effect of depriving court procedures of their legitimacy.
8                           b)      Not Restricted to Prior Litigation
9             The Moores argue the sham exception is not applicable to this case, because the
10   exemption is restricted to prior litigation.  *See* Reply at 8–9, ECF No. 59.  In support of this
11   argument, the Moores cite to *Kearney* and *Sosa* as two cases in which the court applied the sham
12   exception to conduct arising in prior litigation.  *Id.* (citing *Kearney*, 590 F.3d at 646; *Sosa*,
13   437 F.3d at 940).  While these cases do illustrate how the sham exception can be predicated upon
14   activity in prior litigation, they do not stand for the proposition that the exception must be based
15   on prior sham litigation activity.
16            Moreover, the Moores' contention is flatly contradicted by Ninth Circuit
17   precedent.  In *Or. Nat. Res. Council v. Mohla* ("*Oregon*"), the Ninth Circuit assumed the sham
18   exception could apply to the plaintiff's current suit against defendant.  944 F.2d 531, 535 (9th Cir.
19   1991).  In assessing whether the plaintiff's conduct in that case constituted a sham, the circuit
20   looked at conduct giving rise to the pending litigation.  *Id.*; *see also Meridian Project Systems,*
21   *Inc. v. Hardin Construction Company, LLC*, 404 F. Supp. 2d 1214, 1222 (E.D. Cal. 2005)
22   (assuming without deciding activities giving rise to pending litigation could give rise to sham
23   exception).
24            Given the decision in *Oregon,* the court determines whether the exception applies
25   to the Moores' conduct here.  At the same time, the court bears in mind the Ninth Circuit's
26   admonition that courts should be critical in reviewing claims to determine whether the sham
27   exception is properly invoked, particularly where the conduct at issue is presumptively protected
28

1  by the First Amendment. *Energy Conservation, Inc. v. Heliodyne, Inc.*, 698 F.2d 386, 389 (9th
2  Cir. 1983).

3              2.       Doctrine and Sham Exception Applied Here

4         Counterclaimants allege the activity giving rise to their RICO claim involves filing
5  or sending "complaints, discovery, correspondence, and other documents related to the litigation."
6  Countercl. ¶¶ 67, 72. These transmissions qualify as petitioning activity, for they are essentially
7  litigation activity comprising or relating to "communication[s] to the court." *Freeman v. Lasky,*
8  *Haas & Cohler*, 410 F.3d 1180, 1184 (9th Cir. 2005). Accordingly, counterclaimants must plead
9  sufficient allegations to show the sham exception applies and is not improperly raised in an effort
10 to chill speech.

11        Counterclaimants allege the third type of sham exception identified in *Sosa, supra,*
12 is directly applicable to this case, for the Moores allegedly engaged in "knowing fraud upon, or
13 intentional misrepresentation to, the court which deprive[d] the litigation of its legitimacy."
14 Countercls.' Opp'n at 10; *cf. Sosa*, 437 F.3d at 938. Specifically, counterclaimants say the
15 Moores lied about Ronald Moore's disability, in addition to his visits to Zlfred's. Opp'n at 11.

16        To determine whether the Moores' alleged misrepresentations deprive the
17 litigation of its legitimacy, the court first assesses whether the misrepresentations would be
18 material to this court's analysis of each of the Moores' claims. *Cf. Clipper Exxpress v. Rocky*
19 *Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1261 (9th Cir. 1982) (holding party's
20 misrepresentations are material if they help party prove claim).

21                    a)       Materiality of Misrepresentations

22                         (1)      ADA and Unruh Act

23        Title III of the ADA prohibits discrimination against persons with disabilities in
24 places of public accommodation. 42 U.S.C. § 12182(a). An individual alleging discrimination
25 under Title III must show (1) he is disabled as that term is defined by the ADA; (2) the defendant
26 is a private entity that owns, leases, or operates a place of public accommodation; (3) the
27 defendant employed a discriminatory policy or practice; and (4) the defendant discriminated
28 against the plaintiff based upon the plaintiff's disability by (a) failing to make a requested

1  reasonable modification that was (b) necessary to accommodate the plaintiff's disability.
2  *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1082 (9th Cir. 2004).  A violation of the
3  ADA also constitutes a violation of the Unruh Act.  *See Wilson v. Haria & Gogri Corp.*,
4  479 F. Supp. 2d 1127, 1135 (E.D. Cal. 2007) ("The Unruh Act was amended in 1992 to include
5  the following language (now codified at Cal. Civ.Code § 51(f)): A violation of the right of any
6  individual under the Americans with Disabilities Act of 1990 (Public Law 101–336) shall also
7  constitute a violation of this section.").

8  Seeking to avoid unreasonable burdens on ADA plaintiffs, Title III explicitly
9  provides it does not require "a person with a disability to engage in a futile gesture if such person
10 has actual notice that a person or organization . . . does not intend to comply" with the ADA.
11 *Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133, 1136 (9th Cir. 2002).  Thus, a plaintiff
12 need not visit the place of public accommodation in order to have suffered an injury.
13 *Id.* at 1136–37; *see also Ervine v. Desert View Reg'l Med. Ctr. Holdings*, LLC, 753 F.3d 862, 867
14 (9th Cir. 2014).  Rather, "under the ADA, once a plaintiff has actually become aware of
15 discriminatory conditions existing at a public accommodation, and is thereby deterred from
16 visiting or patronizing that accommodation, the plaintiff has suffered an injury." *Id.*

17 On the other hand, a plaintiff does bear the burden to establish he is disabled as the
18 term is defined by the ADA.  *See Fortyune*, 364 F.3d at 1082.  The ADA provides that a
19 "disability" is a condition that fits into one or more of these categories: "(A) a physical or mental
20 impairment that substantially limits one or more of the major life activities of such individual;
21 (B) a record of such an impairment; or (C) being regarded as having such an impairment."
22 42 U.S.C. § 12102(2); *Botosan v. Paul McNally Realty*, 216 F.3d 827, 837 (9th Cir. 2000).  Major
23 life activities include walking, standing, and bending.  42 U.S.C. § 12102(2)(a).

24 Here, to determine ultimately whether the Moores violated the ADA or the Unruh
25 Act, the court need not determine whether Mr. Moore actually visited Zlfred's restaurant.
26 Accordingly, the court could resolve the ADA and Unruh claims in Moore's favor even if his
27 claims of visitation are false, without turning a blind eye to any falsehoods presented to the court.
28 Moore, however, would be required to present evidence that Zlfred's did not provide adequate

accommodations and that Moore was deterred from enjoying the restaurant. *See Fortyune*, 364 F.3d at 1082. Misrepresentations to the court regarding visits to Zlfred's restaurant would not necessarily undermine Moore's ability to prove his claim.

On the other hand, material misrepresentations of disability would affect the litigation's legitimacy, for disability is an essential element of an ADA claim. The Moores cite to *Oregon*, 944 F.2d at 536, in arguing the alleged misrepresentations to the court regarding disability raise merely disputed issues and cannot constitute misconduct or qualify as misrepresentations. Reply at 5. The court disagrees.

This is not simply a case where the plaintiff and defendant are disputing what it means to be disabled or whether Moore is disabled within the meaning of the ADA. Rather, counterclaimants have alleged Moore lied to the court regarding his disability. This case is thus distinguishable from *Oregon*, in which it was not clear that plaintiff's attempt to enjoin the United States Forest Service would fail because application of the statute governing the claim was a "difficult, unresolved issue" due to its "extraordinary language." *Oregon*, 944 F.2d at 535. In contrast, the ADA is relatively straightforward in its definition of disability. If Moore is not disabled, the ADA would not apply.

Here, Mr. Moore says he is disabled because he requires the use of a wheelchair. Compl. ¶ 9. If this is true, he is "disabled" in accordance with the ADA. *See* 42 U.S.C. § 12102(2) (major life activities include walking, standing, and bending). Counterclaimants allege Moore does not require assistance of a wheelchair and in fact can walk without assistance. Countercl. ¶¶ 51–53. They also allege facts saying Moore has been seen standing up, kicking while standing, walking over uneven surfaces, bending over to pick up items, and lifting his wheelchair into the trunk of his car, all without assistance. *Id.* If the allegation that Moore does not require a wheelchair is true, Moore is not disabled within the definition of the ADA. Accordingly, his representations to the court regarding his disability, to the extent untrue, would be material misrepresentations such that Moore could not prove his ADA claim.

(2) California Health and Safety Code §19955(a)

The California Health and Safety Code requires that all public accommodations constructed in California adhere to the requirements of California Government Code § 4450. Cal. Health & Safety Code § 19955(a). Government Code § 4450(a) provides that "all buildings, structures, sidewalks, curbs, and related facilities . . . shall be accessible to and usable by persons with disabilities." The California Health and Safety Code also provides that "[e]very existing public accommodation constructed prior to July 1, 1970, which is not exempted by Section 19956, shall be subject to the requirements of this chapter when any alterations, structural repairs or additions are made to such public accommodation." Cal. Health & Safety Code § 19959.

Plaintiff's claim under section 19955(a) turns on whether (1) defendant made any alterations to specific areas within buildings built before 1970; and (2) whether those alterations are in compliance with relevant accessibility requirements. *Hodges v. El Torito Restaurants, Inc.*, No. 96-2242, 1998 WL 95398, at *5 (N.D. Cal. Feb. 23, 1998). As with the ADA and Unruh Act claims, while the question of whether plaintiff is disabled may be material, no case law requires that plaintiff has visited the facility to prove a § 19955(a) claim.

In sum, misrepresentations about Moore's disability status, but not Moore's purported visits, would deprive these court proceedings of their legitimacy.

b) Knowledge of Misrepresentations

In addition to materiality, knowledge of the falsity of a representation is required to satisfy *Sosa's* third type of sham exception. *Sosa*, 437 F. 3d at 938. Counterclaimants do allege Ronald Moore, Kenneth Moore, Geoshua Levinson and WCC made knowing misrepresentations to the court regarding Ronald Moore's disabilities. Countercls.' Opp'n at 11. Counterclaimants also allege Moore claims to be disabled when in fact he is not. Countercl. ¶¶ 13, 51, 53. As to Kenneth Moore, counterclaimants allege employees of the Moore Law Firm, under Kenneth Moore's direction, prepared fraudulent correspondence and documents related to the litigation. *Id.* ¶¶ 69, 76. Counterclaimants allege Randy Moore, who was a supervisor, and other employees at the Moore Law Firm, knew or should have known about the fraud. *Id.* ¶ 70. As to Geoshua Levinson and WCC, counterclaimants allege Levinson's company, WCC, created

15

a website that deceived companies into self-reporting ADA violations. *Id.* ¶ 37. In turn, Kenneth Moore's law firm used this information to initiate ADA litigation. *Id.* ¶ 38.

These allegations are insufficient to plead that persons other than Ronald Moore and Kenneth Moore made knowing misrepresentations to the court. That Ronald Moore says he is disabled in court documents, but can actually walk without assistance, allows an inference that he advanced knowing misrepresentations to the court. As to Kenneth Moore, counterclaimants allege he directed his employees to make misrepresentations to the court in the filing of more than 250 ADA lawsuits on Ronald Moore's behalf; the court can plausibly infer at this stage that Kenneth Moore knew the lawsuits rested on misrepresentations to the court. *See Twombly*, 550 U.S. at 545 ("Asking for plausible grounds does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [activity]."). On the other hand, the allegations do not suffice to say Levinson or WCC made any misrepresentations to the court, much less untruthful ones.

To the extent the sham exception applies, it applies only to Ronald Moore and Kenneth Moore. As a result, the court dismisses the RICO claims against Levinson and WCC. The court now evaluates the balance of the motion to dismiss on its merits.

B.   Pleading of RICO Claim

The elements of a RICO claim are "(1) conduct; (2) of an enterprise; (3) through a pattern (4) of racketeering activities (known as predicate acts); (5) causing injury to the plaintiff's business or property." *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996). The fifth element has two subparts: (1) the plaintiff must show that the injury was proximately caused by the conduct; and (2) that he has suffered a concrete financial loss. *Chaset v. Fleer/Skybox Intern., LP*, 300 F.3d 1083, 1086 (9th Cir. 2002). Congress enacted RICO "to combat organized crime, not to provide a federal cause of action and treble damages" for personal injuries. *Id.* at 1087.

Counterclaimants contend they can recover damages in the form of attorneys' fees and costs arising from the underlying suit. Countercls.' Opp'n at 17. Although the Ninth Circuit

has not formally addressed the question[5], other circuits have held prior legal expenses are cognizable as injury under RICO. *See, e.g., Handeen v. Lemaire*, 112 F.3d 1339, 1354 (8th Cir. 1997) (prior legal expense "qualifies as an injury to business or property that was proximately caused by a predicate act of racketeering"); *Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1166–67 (2d Cir. 1993) ("Legal fees may constitute RICO damages when they are proximately caused by a RICO violation."). District courts in this circuit have come to the same conclusion. *See e.g., Lauter v. Anoufrieva*, 642 F. Supp. 2d 1060, 1085 n.33 (C.D. Cal. 2009) (attorneys' fees and legal expenses incurred in other proceedings that are proximately caused by a RICO defendant's wrongful conduct may be cognizable injuries under RICO); *Burger v. Kuimelis*, 325 F. Supp. 2d 1026, 1035 (N.D. Cal. 2004) (same).

Even if legal fees are available as RICO damages, however, an award is subject to one critical limitation: that the legal fees stem from prior legal disputes, and not the RICO lawsuit itself. *Menjivar v. Trophy Props. IV DE, LLC*, No. 06-03086, 2006 U.S. Dist. LEXIS 76245, *35–36 (N.D. Cal. Oct. 6, 2006). Otherwise the RICO injury requirement could be easily satisfied in every case. *Cobb v. JPMorgan Chase Bank, N.A.*, No. 12-01372, 2012 WL 5335309, at *6 (N.D. Cal. Oct. 26, 2012) *aff'd*, 594 F. App'x 395 (9th Cir. 2015).

Here, counterclaimants ask to be compensated for attorneys' fees and costs incurred in contesting claims raised in plaintiff's complaint. Countercls.' Opp'n at 17. These are the very damages on which a RICO claim cannot proceed. Accordingly, counterclaimants do not state a viable RICO claim.

V.   LEAVE TO AMEND

Under Rule 15 of the Federal Rules of Civil Procedure, leave to amend is to be granted freely. Fed. R. Civ. P. 15(a). The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request to amend the pleading was made, unless it

---

[5] In an unpublished decision, the Circuit has noted its declination to reach the question. *Thomas v. Baca*, 308 F. App'x 87, 88 (9th Cir. 2009) (unpubl.) ("This court has not recognized the incurment of legal fees as an injury cognizable under RICO, and we decline to do so here").

determines that the pleading could not possibly be cured by the allegation of other facts." *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995).

Here, because counterclaimants cannot obtain damages for legal fees incurred in the underlying case, their RICO claim is dismissed without leave to amend at this time, but without prejudice. During hearing, counterclaimants' counsel conceded dismissal at this time would not be prejudicial to the RICO claim, which may be brought in the future.

VI. CONCLUSION

In light of the foregoing, the Moores' motion to dismiss is GRANTED. Counterclaimants' motion to extend discovery is DENIED as MOOT, but with the clarification that the district judge now assigned to the case of course has the authority to schedule the case as he sees fit. Counterclaimants' motion for sanctions also is DENIED.

This order resolves ECF Nos. 41-1, 51-1 & 58.

IT IS SO ORDERED.

DATED: May 12, 2016.

UNITED STATES DISTRICT JUDGE